UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| NORMAN GIRARDIN | ) | Case No. 05-61129 |
| | ) | |
| Debtor | ) | |
| _____ | ) | |
| KAREN WADE | ) | |
| | ) | |
| Plaintiff | ) | AP No. 06-3043 |
| | ) | |
| vs. | ) | |
| NORMAN GIRARDIN | ) | |
| | ) | |
| Defendant | ) | |

**MEMORANDUM**

This matter came before the Court for trial on April 3, 2007. Both the Plaintiff, Karen Wade ("Wade") and the Defendant, Norman Girardin ("Girardin") appeared with counsel. The Court considered the testimony and exhibits presented at trial on the Complaint Objecting to Discharge filed by Wade against Girardin. The Court enters the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Bank. P. 7052.

**FINDINGS OF FACT**

1. Wade and Chris Wade ("Chris") were married for 13 years and produced three daughters during that marriage.

2. In 1997, Chris left TKR (now Insight Cable) and formed a company with Girardin, Primestar of Kentuckiana, later known as Satellite Central. Chris and Girardin incorporated the company with Chris holding 400 shares of stock and Girardin holding 400 shares of stock. The corporation issued two hundred shares of stock that were not distributed, the reserve

stock. Chris was elected president and Girardin elected vice-president and secretary-treasurer of the corporation. The corporation held no other board members.

3. According to the Minutes of Meeting of the Board of Directors held on March 1, 2000, the corporation held assets valued at $534,339.27 and liabilities totaling $19,656.36, leaving a net worth of $514,682.91.

4. Wade acted as a part time office manager when the company first started. She performed a number of office duties, including bookkeeping. In her capacity as office manager, she obtained a credit card in the company name, although she personally guaranteed payment of any charges on the account.

5. The corporation paid Chris and Girardin an equal amount in wages every two weeks, and they both took draws in an equal amount from the company every other week.

6. From 1998 to 2000, the business generated substantial profit with wages and draws for Chris and Girardin increasing each year.

7. The business operated by Chris and Girardin involved the sale and installation of satellite television systems. For every sale, the company would receive a residual fee from other satellite companies. In the event a customer cancelled an order within the first year, the business would be billed a pro rata portion of that fee through a process called a chargeback. Typically, chargebacks totaled about 10-12% of total fees.

8. In addition to operating this satellite business, Chris "day traded," which is the buying and selling of stocks on a short term, daily basis. At times, Chris lost substantial amounts of money day trading.

9.  On December 14, 2000, Chris committed suicide, leaving a will naming Wade as his sole beneficiary.

10. Although Wade received few, if any, wage checks in 2001, she received draw checks well into 2001, several months after Chris's death. Girardin received the same amount in draws as Wade.

11. After Chris's death, due to personal reasons, Wade stopped working at the company. Around this same time, relations between Wade and Girardin deteriorated and Girardin stopped informing Wade about the company's operation. Furthermore, the company ceased paying the rental amount on Wade's vehicle, which led to its repossession, and ceased making payments on the credit card guaranteed by Wade. At the time the credit card payments ceased, the balance due on the card totaled $8,465.63, all relating to charges incurred after Chris's death. Wade presented no proof that the charges consisted of anything other than routine ordinary course of business expenses. Due to her personal guaranty on the credit card, Wade paid $4,250 to obtain a release from the credit card company for the balance of the debt.

12. Girardin also caused the locks of the company to be changed, which precluded Wade from personally inspecting the premises. Girardin explained changing the locks as a standard procedure of the company whenever the company terminated employees, which occurred during this time. He further testified that Wade never requested new keys.

13. At some point after Chris's death, Girardin effected the sale of the reserve stock to four individuals: Mark O'Brien, Michael Webb, Robert Benish, and William Block. Girardin

       shared relations with several of these individuals. Girardin took these actions without the knowledge or consent of Wade and in violation of the bylaws of the corporation, which required a majority of shareholders to approve the sale of the 200 shares of reserved stock. Wade presented no evidence that Girardin personally and solely benefitted from the sale of these shares, other than as a general shareholder

14. At some point shortly after Chris's death, Girardin, in violation of the bylaws of the corporation requiring majority consent, solely caused to be executed a document appointing Michael Webb as a director, to serve out the remaining unexpired term of Chris Wade. As with the sale of the stock, Wade neither knew of, nor consented to this action.

15. In July 2001, Girardin caused to be executed a new Shareholders Agreement, which materially changed the bylaws of the corporation. While three of the four new, unauthorized shareholders signed off on this agreement, Girardin neither informed Wade of this agreement nor obtain her consent to the agreement.

16. On July 5, 2001, Wade informed Girardin she intended to call a special meeting of shareholders to rescind several actions of the Board of Directors, including the issuance of the new stock, the election of officers, and the election of the Board of Directors. She scheduled this meeting to be held on July 19, 2001. Neither Girardin nor the other unauthorized shareholders attended the meeting on July 19, 2001. Instead, they sent Mr. Craig Sparks ("Sparks"), an attorney hired to represent the corporation, to attend the meeting on their behalf, for which he received compensation of $10,000 in stock purchases of a different company being promoted by Sparks. At the meeting, Sparks informed Wade she

could neither serve as an officer or board member, not inspect the corporate bookkeeping.

17. As 2001 progressed, the company suffered increasing financial setbacks. The advertising bills as well as the chargebacks owed by the company increased significantly. When the financial losses continued, Girardin stopped taking draws and started taking a $3,000 monthly salary. Both Wade and Girardin stopped receiving draws at the same time, after $16,500 in draws had been disbursed by the company.

18. In January 2002, the company shut down. While some outside interest in purchasing the company existed, Girardin received no offers for the company. Girardin exchanged many of the company's assets to satisfy company debts. Girardin either kept no accounting or failed to provide such an accounting for these transactions. Girardin also testified that some assets were stolen, but could not remember if he filed a police report. While Girardin provided no final accounting to Wade after the close of the business, Wade presented no evidence that Girardin kept any assets or the proceeds of any corporate assets.

19. On July 16, 2002, Wade commenced suit against Girardin in Jefferson Circuit Court alleging that Girardin violated "basic notions of decency," violated the terms of the business agreement, "took money to which Karen was entitled," charged or allowed to be charged unauthorized charges on the company credit card, "misrepresented his intentions," and intentionally kept Wade uninformed.

20. On March 31, 2005, Jefferson Circuit Court entered an Agreed Order awarding Wade a judgment against Girardin in the amount of $100,000 for "her losses claimed in the above-styled action."

21. On October 15, 2005, Girardin filed for relief under Chapter 7 of the Bankruptcy Code. Wade initiated this adversary against Girardin on March 15, 2006, seeking to except the debts owed to her by Girardin under the provisions of 11 U.S.C. § 523(a)(6) (willful and malicious injury). Although Wade also cited 11 U.S.C. § 727 (denial of discharge), she plead no allegations with respect to that section.

22. Although not plead in her complaint, Wade argued in her pre-trial brief that Girardin's actions constitute cause for this debt to be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2) (actual fraud or misrepresentation) and (a)(4) (fraud or defalcation while acting in a fiduciary capacity). She also alleged Girardin should be collaterally estoppel from disputing that his actions were fraudulent.

23. At the beginning of the trial, Girardin moved that Wade be precluded from presenting evidence as to the § 523(a)(2) and (a)(4) counts because Wade plead neither in her complaint, nor added by amendment. The Court sustained the motion with respect to the § 523(a)(4) count, but held that proof could be presented as to the § 523(a)(2) count because those allegations were sufficiently similar to the § 523(a)(6) allegations that Girardin would not be prejudiced.

## **CONCLUSIONS OF LAW**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I), and venue is proper under 28 U.S.C. § 1409(a). The parties have submitted to the jurisdiction of this Court.

The Court will first address the collateral estoppel issue. Wade contends that the Agreed

6

Order entered in the Jefferson Circuit Court action precludes Girardin from contesting that his actions are either fraudulent in character or simply willful and malicious, and, consequently, the Court should grant her judgment on either her § 523(a)(2) count or her § 523(a)(6) count. Girardin counters that since the Agreed Order did not specify as to the source of the damages, this Court should not apply collateral estoppel to preclude him from contesting the allegations in Wade's complaint.

Collateral estoppel "precludes relitigation of issues of fact or law actually litigated and decided in a prior action between the same parties and necessary to the judgment, even if decided as part of a different claim or cause of action." Sanders Confectionery Prods., Inc. v. Heller Fin., Inc., 973 F.2d 474, 480 (6th Cir.1992). "[T]he whole premise of collateral estoppel is that once an issue has been resolved in a prior proceeding, there is no further factfinding function to be performed." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 336 n. 23, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Collateral estoppel may be used in the bankruptcy context to preclude parties from re-litigating issues previously litigated in a state court forum. Spilman v. Harley, 656 F.2d 224, 228 (6th Cir. 1981). Specifically, collateral estoppel may be applied in dischargeability proceedings, such as this adversary proceeding. To invoke collateral estoppel, a party must (1) show the precise issue was raised in the prior proceeding between the same parties or parties in privity with them, (2) show it was actually litigated, and (3) show that its determination was necessary to the outcome in state court. Id.

As applied to this adversary proceeding, this Court cannot find that the three elements are met. First, due to the drafting of the state court complaint, it is anything but clear the precise nature

of the allegations brought against Girardin. The complaint ranged from conversion to breach of contract, to misrepresentation, to fraud, to tortuous interference with contracts. Moreover, the Agreed Order is completely silent as to what theory of recovery the $100,000 is attributed. Without knowing the precise theory of recovery involved, or to what theory the Agreed Order is apportioned, this Court cannot find as a matter of law what issues Wade and Girardin actually litigated, or that the this determination was necessary to the outcome of the state court proceeding. Consequently, collateral estoppel may not be invoked to prevent Girardin from contesting Wade's allegations in her complaint.

The Court now turns to the § 523(a)(2) and (6) allegations. Subsection 523(a)(2)(A) provides that an individual debtor's debt incurred "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – false pretenses, a false representation, or actual fraud" will not be discharged in bankruptcy. The Sixth Circuit has held that to except a debt from discharge under § 523(a)(2)(A), "the creditor must prove that the debtor obtained money through a material misrepresentation that at the time the debtor knew was false or made with gross recklessness as to its truth. The creditor must also prove the debtor's intent to deceive. Moreover, the creditor must prove that it reasonably relied on the false representation and that its reliance was the proximate cause of the loss." Atassi v. McLaren ( In re McLaren ), 990 F.2d 850, 852 (6th Cir. 1993). Creditors bear the burden to show fraud by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Finally, exceptions to discharge are strictly construed against creditors. See In Re Rembert, 141 F.3d 277, 281 (6th Cir. 1998), cert. denied subcontractor. nom. AT&T Universal Card Servs. v. Rembert, 525 U.S. 978, 119

S.Ct. 438, 142 L.Ed. 2d 357 (1998).

This Court finds Wade failed to meet her burden or proof with respect to this claim. First, Wade failed to prove Girardin obtained money or property by his actions. Indeed, it appears to this Court that Girardin re-invested into the corporation all the money or property obtained by his actions. Wade failed to present even a scintilla of evidence that Girardin personally benefitted from any of the actions alleged. Furthermore, Wade presented no evidence of a material misrepresentation by Girardin to Wade, that she relied upon any material misrepresentation, or that the reliance proximately caused her loss. While the evidence certainly proved Girardin took unauthorized actions in violation of the corporate bylaws, this alone does not make the debt non-dischargeable by virtue of § 523(a)(2)(A). Additionally, the fact that the corporation failed relatively soon after the passing of Chris Wade does not amount to fraud or misrepresentation. While it can certainly be argued that Girardin did not operate the company to the same level as Chris Wade, this deficiency does not make this debt nondischargeable under § 523(a)(2)(A).

Turning to the § 523(a)(6) issue, under the Bankruptcy Code, debts arising from the willful and malicious injury by the debtor to another or another's property may be excepted from discharge in bankruptcy. 11 U.S.C. § 523(a)(6). As with § 523(a)(2)(A) actions, the creditor bears the burden of proving the elements of § 523(a)(6) by a preponderance of the evidence. Grogan, 498 U.S. at 286-87. Subsection 523(a)(6) provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

9

The willful and malicious standard is a stringent one, and "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." Kawaauhau v. Geiger, 523 U.S. 57, 64, 118 S.Ct. 974, 140 L.Ed. 2d 90 (1998). The Sixth Circuit, post Geiger, has held that "[a]n intentional or deliberate act alone does not constitute willful and malicious conduct under § 523(a)(6)." In re Romano, 59 Fed. Appx. 709, 2003 WL 731723, at *6-7 (6th Cir. 2003). Instead, the creditor must prove that the debtor intended a deliberate or intentional injury, not merely a deliberate or intentional act that causes injury. "[Unless] the actor desires to cause [the] consequences of his act, or . . . believes that the consequences are substantially certain to result from it, he has not committed a willful and malicious injury as defined under § 523(a)(6)." In re Kennedy, 249 F.3d 576, 580 (6th Cir. 2001) (citation and internal quote omitted).

In this case, again, Wade failed to meet her burden of proof. Wade presented no proof showing Girardin intended to injure Wade. To the contrary, his actions showed he intended for the corporation to succeed, to the benefit of both Wade and Girardin. Furthermore, Wade presented no evidence Girardin intentionally injured Wade by converting or otherwise stealing any asset of the corporation in which Wade held an interest as a shareholder. Indeed, the evidence showed that Wade and Girardin shared equally in all distributions from the corporation. Finally, as with the § 523(a)(2) allegations, Wade did prove that Girardin took several unauthorized actions, that he violated the corporate by-laws, and that he failed to successfully run the corporation. These actions, without more, are insufficient for this Court to find this debt should be excepted from discharge pursuant to § 523(a)(6). A judgment accompanying this Memorandum shall be entered this same date.

UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| NORMAN GIRARDIN | ) | Case No. 05-61129 |
| | ) | |
| Debtor | ) | |
| | ) | |
| KAREN WADE | ) | |
| | ) | |
| Plaintiff | ) | AP No. 06-3043 |
| | ) | |
| vs. | ) | |
| NORMAN GIRARDIN | ) | |
| | ) | |
| Defendant | ) | |

## JUDGMENT

Pursuant to the Court's Memorandum entered this date and incorporated herein by reference, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that the complaint filed by the Plaintiff, Karen Wade, is **DISMISSED**.

This is a final and appealable order and there is no just reason for delay.